1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ARIZONA

3    United States of America,    )  4:19-cr-02738-RM-JR-1
                                  )
4              Plaintiff,         )
                                  )
5    vs.                          )
                                  )  Tucson, Arizona
6    Jan Peter Meister,           )  December 9, 2019
                                  )
7              Defendant.         )
     _____)

8

9      Before the Honorable Rosemary Márquez, District Judge

10                   Transcript of Proceedings
       Hearing on Appeal from Magistrate Judge Order of Detention

11

12   APPEARANCES:

13   For the Government:
          U. S. Attorney's Office
14        Nicole P. Savel, AUSA
          Beverly K. Anderson, AUSA
15        405 W. Congress Street, Suite 4800
          Tucson, AZ 85701-5040
16        (520) 620-7300

17   For the Defendant:
          Roach Law Firm, LLC
18        Bradley K. Roach, Esq.
          101 E. Pennington Street, Suite 201
19        Tucson, AZ 85701
          (520) 628-4100

20

21   Proceedings reported and transcript prepared by:
          A. Tracy Jamieson, RDR, CRR - Official Court Reporter
22        Evo A. DeConcini U.S. Courthouse
          405 West Congress, Suite 1500
23        Tucson, Arizona 85701
          (520) 205-4266

24

     Proceedings reported by court reporter using steno machine
25   shorthand; transcript prepared with court reporting software.

1          INDEX OF EXAMINATIONS

2

3    WITNESSES:                                        PAGE

4

**SPECIAL AGENT CHRIS DESROSIERS**

5

6        Direct Examination By Ms. Savel....................... 12

7        Cross-Examination By Mr. Roach....................... 24

8        Redirect Examination By Ms. Savel.................... 32

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (On the record at 1:50 p.m. as follows:)

2          THE CLERK:  In Criminal Matter 2019-2738.  United

3     States of America versus Jan Peter Meister, on for appeal from

4     detention order.  Counsel, please state your appearance.

5          MS. SAVEL:  Good afternoon, Your Honor.  Nicole Savel

6     and Bev Anderson appearing on behalf of the United States.

7          MR. ROACH:  Good afternoon, Your Honor.  Brad Roach on

8     behalf of Mr. Meister, who is present, in custody, to my left.

9     Judge, as a note of clarification, I filed a notice of

10    appearance, but I do intend to substitute for Elena Kay, the

11    public defender who had been previously assigned this case.  I

12    just didn't have Mr. Meister sign a substitution when I went up

13    to see him, so I will get that piece of paper.  And I think I

14    had my staff leave a message with the Court to know that I

15    would be covering this case and Ms. Kay would not be here.

16         THE COURT:  That's fine.  Thank you.

17    Good afternoon.  And good afternoon, Mr. Meister.

18         THE DEFENDANT:  Good afternoon, Your Honor.

19         THE COURT:  This is the defendant's appeal of the

20    magistrate judge's order.  Would you like to be heard?

21         MR. ROACH:  Yes, Your Honor.

22    First, I've had this marked, but I don't know if it's

23    necessary for this hearing, as Defense A.  It was not available

24    at the hearing in front of the magistrate, and it is a letter

25    from a Ron Hess, who's the president of Solar Industries,

1    indicating that there's a job awaiting Mr. Meister at Solar

2    Industries, when and if he is released; so he does have work

3    available to him.

4        Judge, our position is that Mr. Meister is neither a risk

5    of danger, nor is he a risk of flight, in this case, so he

6    should be released to his own recognizance.  But he'd be

7    willing to be released to Pretrial Services; he'd be willing to

8    be released to a third party, his wife here, who is in court in

9    the back beyond Meister.  And the reason we argue that he is

10   neither a flight risk, nor a danger, is a number.

11       But I will start with the allegation in this case is that

12   on October 1st, 2019, Mr. Meister called -- from here in

13   Tucson, called a Congressional -- a member of Congress, Adam

14   Schiff, and made a short, 30-second phone call, message, where

15   he threatened various vulgar things to -- sexual in nature,

16   referring to Mr. Schiff's mother, referring to having --

17   performing acts on Mr. Schiff.  And then he also said, the

18   audio which has been recorded and released to me:  "I am going

19   to blow your brains out."

20       So the position first starts with, Judge, I believe that no

21   effort was made to see if Mr. Schiff's mother was safe or not.

22   And the reason that's important is, if anyone was

23   considering -- the question is this:  Was this a real threat?

24   In other words, was Mr. Meister indicating his intent to drive

25   2,500 miles across the country to actually commit harm onto

1    Mr. Schiff?  Or was this mere puffery because of a political

2    difference of opinion?  And our argument is it was mere

3    puffery.  I'm not saying it's not necessarily illegal once we

4    get down the line, but the question is "Was it an actual threat

5    of danger?" and it was not.  And it was clearly not.

6        We have one of the officers on the line, and I don't know

7    if the Government intends to call that officer.

8        But no effort was made to see if Mr. Schiff's mother was

9    safe.  That's because nobody really thought that this was a

10   threat of something that he was going to do, Mr. Meister was

11   going to do to his mother, or Mr. Meister was going to do to

12   Adam Schiff.  It was a drunken, angry message that was left by

13   Mr. Meister.

14       So that happens on October 1st.  The Capitol Police get it

15   on October 2nd.  On October 3rd, they come to Tucson.  They

16   come to Mr. Schiff's -- or Mr. Meister's place of residence.

17   The gate is locked, so they call him.  He voluntarily comes

18   down, opens the gate and talks to them.  They ask him about the

19   message and he says he doesn't remember leaving it.  Then they

20   play the message, and he actually gets out his own phone and

21   you can see on his phone that he had made that phone call.  He

22   was intoxicated, didn't remember leaving the message.

23       The import here is that at the end of that interview, the

24   Government agents had run a background check on Mr. Meister,

25   had knew about any prior convictions that had been indicated in

1   the Pretrial Services workup, had probable cause to arrest, and

2   chose not to. Because they didn't think he was a threat of

3   flight and they did not think he was a threat of violence.

4       They came back on October 18th with a search warrant for

5   Mr. Meister's property. Again, he lets them in. They're in

6   the house for a good four, six hours, give them coffee and

7   water as they're searching, voluntarily let them search areas

8   that were not covered in the search warrant. That's when the

9   federal agents find the guns that belong to Mr. Meister's wife,

10   which are the ones that are in count two of the indictment

11   that's now been sealed.

12       So at that point they have everything that they already

13   had. The actual audio recording of the -- of the,

14   quote-unquote, threat, and the guns that were in the house, and

15   knowledge of Mr. Meister's prior convictions.

16       Again, they do not arrest him, nor do they -- they do not

17   arrest him because they do not believe he is a threat of

18   violence or a threat of flight at that point.

19       They get an arrest warrant, and then, on October 25th, he's

20   arrested. Again, peacefully, he's arrested.

21       Judge, yes, he has prior convictions, but the most recent

22   prior conviction is 17 years ago.

23       Judge, he is a property owner, he has work ready for him.

24   He's been a property owner in Arizona for many years. There's

25   no indication that he is going to run. There is no indication

1  that he made any plane tickets to go to D.C. to try to execute

2  this, quote-unquote, threat, or that he had planned to drive.

3      In all the time after October 3rd, knowing that federal

4  agents had an audio recording of him making this phone call, he

5  didn't run, he didn't go anywhere, and he knew that this could

6  have come down, this could happen to him.  He did not run

7  because he is not a threat of violence, and he is not a threat

8  of fleeing the jurisdiction, Judge.

9      So our position would be there is no indication and there

10 is no way that the government can meet their burden that he is

11 either one of those things, and then, therefore, he should be

12 released.

13         THE COURT:  Thank you.

14     Ms. Savel?

15         MS. SAVEL:  Your Honor, I just want to put on the

16 record that there is a witness standing by, Agent Chris

17 Desrosiers, from the United States Capitol Police.  Should the

18 Court be inclined to release the defendant, we did want to

19 present testimony regarding dangerousness.  But I will address

20 the defense counsel's comments.

21     First, I do want to make a correction on the record, and I

22 did tell defense counsel about this before the hearing.  In my

23 response to the detention appeal, I indicated at -- I think it

24 was Page 3 of the -- I'm sorry.  Page 6 of my response.  Lines

25 9 through 13.  That there is a presumption in favor of

1  detention if the defendant were indicted with a prohibited

2  processor charge.  Which he has been.  Hence the superseding

3  indictment.  However, the government is entitled to a detention

4  hearing.  There is not a presumption in favor of detention.  I

5  just caught that this morning when I was re-reviewing it.

6          THE COURT:  Thank you.

7          MS. SAVEL:  With regard to the defense counsel's

8  arguments, the case law is such that it's not that the

9  defendant has to carry out the threat, or necessarily be

10  capable of carrying out the threat, but whether or not he

11  intends it to be threatening.  And some of the factors include

12  whether the recipient views it or would view it as a threat.

13  He doesn't need to actually carry that out.  His threat

14  conveyed that he intended to blow the congressman's brains out.

15      And I would also submit that the hearing today, while that

16  goes to the weight of the evidence, the defendant has been

17  indicted on the threats charged, as well as the guns charged,

18  and that's not the sole inquiry.

19      There were a number of things and events, as well as his

20  past conduct, that led to the defendant's arrest.  It was

21  essentially a progression of concern.

22      The agents investigated this threatening voicemail that was

23  left with the congressman.  They made contact with the

24  defendant, as defense counsel noted.  The call was made on

25  December 1st, and they were able to determine where the call

was made from and made contact with the defendant on October 3rd.  He met them at the gate outside of his property.

THE COURT:  The call was made, did you say, December 1st?

MS. SAVEL:  I'm sorry.  October 1st.

THE COURT:  October 1st.

MS. SAVEL:  And they met him on his property.  They traveled to Tucson to assess the threat and were here on October 3rd meeting with the defendant.

They called the number associated with the caller ID with the voicemail, and the defendant answered and he met them outside the gate of his property that he shares with his wife.

When they met with him, he did confirm, by showing his phone, that he had made the phone call, but said that he was drunk and didn't remember making the call.

While he was generally cooperative with agents, he indicated at that time, when they asked if he had any weapons, because they're trying to assess the threat, he said he had a muzzle loader, which is -- and I'm not an expert in guns, but is essentially like a black powder weapon that's loaded through the front or the muzzle of the weapon.  He didn't indicate he had any other weapons, and they left at that time to continue their investigation.

Then, because they were obviously concerned, because a muzzle loader can inflict, you know, lethal force, they

obtained a search warrant from the Court and executed that on

October 18th.

And there, in the defendant's residence that he shares with

his wife, they found multiple weapons.  They found three

federally prohibited firearms and three black powder firearms,

which can be considered antique firearms, for lack of a better

term, that the defendant, because of his prior convictions, may

be able to possess, but, once again, are still capable of

inflicting death.

THE COURT:  Why wasn't he arrested at that point?

MS. SAVEL:  Well, what they do at that time is they

have to go back and they have to have a nexus report done by

ATF regarding the firearms.  And they also need to, quite

frankly, consult to determine what the charges are and see if

they can get an arrest warrant.

They did interview him, and they did have to do more

research, because the defendant, as you would see on his

Pretrial Services report, has some convictions that have been

expunged; so they wanted to determine what his prohibited

possessor status was.  He has some convictions out of Maryland,

as well as some expunged convictions out of Arizona.

When the search warrant was done, that was October 18th,

they did not do a probable cause arrest.  And I would submit

that while they're fully capable of doing that, the

determination about whether or not he is a danger or he's a

1  risk of flight or nonappearance is the Court's determination,

2  not the agents at the time.  They're simply executing a search

3  warrant and trying to gather evidence based on the Court's

4  order.

5      The defendant was then indicted with the threats charge at

6  the soonest possible indictment date, October 23rd, while

7  additional investigation occurred regarding the firearms and

8  the over 700 rounds of ammunition that were also located on the

9  property.

10      THE COURT:  Do you want to take this witness now --

11      MS. SAVEL:  Certainly.

12      THE COURT:  -- so that he is not on the phone?

13      MS. SAVEL:  Certainly.

14      THE COURT:  Let's do that, please.

15      MS. SAVEL:  Agent Desrosiers?

16      AGENT DESROSIERS:  Yes, ma'am.

17      MS. SAVEL:  I just wanted to make sure that you were

18  there.  I'm going to go ahead and start.

19      Could you please tell the Court -- well, I think he needs

20  to be sworn in, even though it's telephonic.  Correct?

21      THE COURT:  Yes.  Thank you.

22      Please raise your right hand, sir.

23      AGENT DESROSIERS:  Okay.

24      **SPECIAL AGENT CHRIS DESROSIERS**, WITNESS, SWORN

25      THE COURT:  Thank you, sir.  You may proceed.

1    MS. SAVEL:  Thank you.

2                    DIRECT EXAMINATION

3    BY MS. SAVEL:

4    Q.  Could you please tell the Court your name and where you

5    work?

6    A.  Special Agent Christopher Desrosiers.  I work for the

7    United States Capitol Police, in Washington, D.C.

8    Q.  What are the roles and responsibilities of the United

9    States Capitol Police?

10   A.  We protect the 535 members of Congress, their employees and

11   their families, both here on Capitol Hill, as most standard

12   police departments, and then nationwide, through our protection

13   details and our investigations.

14   Q.  Were you involved in an investigation regarding a report of

15   a threatening voicemail left on Congressman Schiff's office

16   voicemail in Washington, D.C.?

17   A.  Yes, ma'am.

18   Q.  And when was the voicemail left?

19   A.  The evening of October 1st.

20   Q.  And have you listened to the call?

21   A.  I have.

22   Q.  Or I should call it a "voicemail."

23        And did you have a CD played for you this morning with the

24   call copied on it that has been marked as Exhibit 1?

25   A.  Yes, ma'am.

1   Q.  Did that voicemail that you listened to this morning, did

2   it accurately reflect the call that you heard?

3   A.  Yes, ma'am.

4         MS. SAVEL:  Your Honor, I'd like to move to admit the

5   call and play it.  It's just about 30 seconds.

6         THE COURT:  The call will be admitted.  You may play

7   it.

8      Any objection, Mister --

9         MR. ROACH:  No objection.

10     (Playing of audio CD marked as Exhibit 1.)

11  BY MS. SAVEL:

12  Q.  So based on the call and investigation, did that lead you

13  to make contact with the defendant, Jan Peter Meister, at his

14  residence in southern Arizona?

15  A.  Yes, ma'am.

16  Q.  And when did you go there and who did you go there with?

17  A.  I went there with my supervisor, Supervising Special Agent

18  Abbey Tereba, and a deputy from the local sheriff's office.

19  Q.  Can you describe the residence, the property, when you

20  arrived?

21  A.  Yeah, it was later at night, after 8:00 o'clock at night,

22  so it was very dark.  The property appeared to be fenced in.

23  There was a cattle-style gate at the end of the driveway that

24  was latched in some shape, form, or fashion.  So the main

25  residence was -- looked to be approximately, maybe, 25 or 30

1    yards down the driveway, as a fifth-wheel trailer-style

2    residence.  So the sergeants called, my supervisor called,

3    Mr. Meister on the phone number that was utilized or showed up

4    on caller ID for the voicemail you just played, and Mr. Meister

5    agreed to come out and speak with us.

6    Q.  You mentioned that it was a fifth-wheel trailer.  Is that

7    kind of an RV-type trailer that hooks up to a vehicle and can

8    be pulled to travel?

9    A.  Yes, ma'am.

10   Q.  And you said that Mr. Meister came out and spoke with you.

11   Where did he talk to you at?

12   A.  At the gate.  He opened the gate and stepped through and

13   talked to us there.

14   Q.  Did you all ask him if he had made the call to Congressman

15   Schiff?

16   A.  Yes.

17   Q.  Tell us what happened.

18   A.  He was not -- did not recall the details of the call, but

19   he did pull it up on his call logs and showed that he indeed

20   had made a call to the congressman's Washington, D.C. office.

21   And I played the voicemail recording for him, and he stated

22   that he was drunk.

23   Q.  When he made the call?

24   A.  At the time.  Correct.  Yes.

25   Q.  Did he say what prompted him to make the call?

1    A.  He said he had likely seen something on the news that had

2    upset him and caused him to make the call.

3    Q.  Did you have further conversation with him about different

4    topics, including whether or not he had any weapons in his

5    possession?

6    A.  Yes.  Asked if he had any weapons, and he said that he

7    owned a muzzle loader that he had planned on using for hunting.

8    He hadn't had a chance to utilize it yet, but he was planning

9    on hunting mule deer.

10   Q.  What's a muzzle loader?

11   A.  In this case, it would be a rifle that's loaded through the

12   muzzle.  So the propellant and the projectile are pushed down

13   to the muzzle.  As opposed to a more traditional fixed

14   ammunition, you know, bullets.  It's loaded through the muzzle

15   and loaded in that manner.

16   Q.  So he didn't mention any other weapons or firearms?

17   A.  No, ma'am.

18   Q.  And when you spoke with him that evening, did the defendant

19   seem to understand your questions?  Did he appear under the

20   influence of anything?

21   A.  No, ma'am.  He appeared lucid, coherent.

22   Q.  And then after that conversation with him outside of his

23   property, did you leave?

24   A.  Yes, ma'am.

25   Q.  Why did you not arrest him at that time?

 1   A.  Our...(indiscernible word)...path is to continue with our

 2   investigation, plus consult with the U.S. Attorney's Office,

 3   continue our background check --

 4           THE COURT:  Excuse me, sir.

 5           THE WITNESS:  Yes, ma'am.

 6           THE COURT:  Could you step away or push the phone a

 7   little bit further out?

 8           THE WITNESS:  Okay.  Is this any better?

 9           THE COURT:  Is that better, Tracy?

10           COURT REPORTER:  Yes.

11           THE COURT:  Go ahead.

12           THE WITNESS:  Okay.

13       So to continue down the path of the investigation.

14       In this case, it was to look into further background on

15   Mr. Meister, any kind of open source, or what we call social

16   media type checks, should they exist, and then consult with the

17   U.S. Attorney's Office.  Because he had admitted to having a

18   weapon that would be capable of carrying out the threat that

19   was made during the voicemail.

20       We looked to then move toward a search warrant at the first

21   available opportunity that we had to put the resources to that,

22   and go from there.

23   BY MS. SAVEL:

24   Q.  And was the search warrant executed on October 18th, 2019?

25   A.  Yes, ma'am.

1   Q.  Did agents find weapons, firearms, and ammunition in the

2   residence and on the property?

3   A.  Yes, ma'am.

4   Q.  Were you part of the search warrant execution?

5   A.  I was.

6   Q.  So let's just talk about where items were found.

7        To back up, with the RV itself, can you just describe how

8   it's laid out, very briefly?

9   A.  Sure.  When you come in the main entrance, front door, if

10  you will, to your left-hand side is a living room type area

11  with a table.  And then also the kitchen area is on that side

12  of the RV.  Straight ahead is a bathroom/laundry area.  Then up

13  a couple steps to the right-hand side was what would be the

14  master bedroom, through the edge of the master bathroom and a

15  closet in there.

16  Q.  And when you say, "master bedroom," was there only one

17  bedroom in the trailer or RV?

18  A.  Yes, ma'am.

19  Q.  And let's start at the entryway.  Were there any weapons

20  located in the entryway?

21  A.  Yeah, it's adjacent to the entryway, in the main living

22  area, there is a small statue, and there was a black powder

23  revolver kind of in the lap -- a holster in the lap of that

24  statue.

25  Q.  And was that a black powder revolver?

1   A.  Yes, ma'am.

2   Q.  And then, moving onto the master bedroom, were there any

3   firearms, weapons, located there?

4   A.  Yes, ma'am.  If you were kind of facing -- at the end of

5   the bed, facing the bed, to the left-hand side of the

6   nightstand, there was a Taurus handgun.  In the -- some

7   under-bed storage, there was another black powder revolver.

8   And to the right of the bed, next to the other nightstand, on

9   that side, in a case, was the muzzle loader rifle.

10  Q.  And then the .380 Taurus, did you say that that was in the

11  nightstand, next to the --

12  A.  Yes, ma'am.  Yes.

13  Q.  Did that have a loaded magazine in it?

14  A.  Yes, ma'am.

15  Q.  And then was the nightstand locked or anything?

16  A.  No, ma'am.

17  Q.  Were there also firearms located in a storage container on

18  the property?

19  A.  Yes.  There was a small, shipping-style container not far

20  from the -- kind of the front entrance of the RV.  You walk

21  down the driveway, it was off to -- if you're walking down the

22  driveway to walk off the property, it would be off to your

23  left-hand side.  Inside there, there was an AR-style rifle, as

24  well as a 9 millimeter handgun.

25  Q.  The 9 millimeter handgun, did that have a loaded magazine?

1  A.  Yes, ma'am.

2  Q.  Was that on a shelf in the storage container?

3  A.  It was.

4  Q.  And the American Tactical rifle, did that have ammunition

5  with it as well in a case?

6  A.  Yes, ma'am.

7  Q.  Was the storage container locked?

8  A.  No, ma'am.

9  Q.  Was there also a small safe located in the master bathroom

10  closet?

11  A.  Yes, ma'am.

12  Q.  And where was the key to that safe?

13  A.  It was on a key chain.  Mr. Meister referred to it as

14  community keys that had keys to the vehicles as well.

15  Q.  What was located in that safe?

16  A.  It was a box, a 9 millimeter handgun, as well as some 9

17  millimeter ammunition.

18  Q.  Was there also a storage area that is part of the front of

19  the outside of the RV?

20  A.  Yes.  On the same side as the main entrance door, yes.

21  Q.  And what did you all locate in there?

22  A.  There were a number of pieces of ammunition or firing kits

23  for the weapons that were on the property.

24  Q.  About how many total rounds of ammunition were located?

25  A.  In total, I believe there was between 750 and 800 rounds.

1  Both counting the loose rounds, or, you know, the boxed rounds,

2  not in weapons, as well as what was found to be in the

3  magazines and weapons themselves.

4  Q.  Was there any kind of trace done on the firearms regarding

5  ownership?

6  A.  Yes, ma'am.

7  Q.  What's the information you all have so far?

8  A.  For the American Tactical rifle, as well as the Taurus, the

9  owner appears to be Mr. Meister's wife, Dee-Ann (phonetic).

10  Q.  And by "owner," would that be the purchaser?

11  A.  Correct.

12  Q.  And what about the 9 millimeter pistol?

13  A.  The 9 millimeter pistol, to the best of my knowledge, I

14  believe we're still waiting on results on that.

15  Q.  What about the black powder firearms, can those -- to your

16  knowledge, can those be traced?

17  A.  No, they wouldn't be considered, federally, a firearm.

18  Q.  Was there any kind of information in the residence about

19  who had purchased two of the black powder revolvers?

20  A.  There was.  It appeared to be a Cabela's receipts or

21  purchase order for those revolvers.  It appeared that they were

22  purchased in June of 2019.

23  Q.  By who?

24  A.  By Dionne Meister.

25  Q.  Did you say Dionne Meister?

1  A.  Yes, ma'am.

2  Q.  Just for the record, is that D-i-o-n-n-e, for the first

3  name?

4  A.  Yes, ma'am.

5  Q.  Is that the defendant's wife?

6  A.  Yes, ma'am.

7  Q.  And then based on your observations of the residence and

8  the property, were all firearms and ammunition accessible by

9  both the defendant and his wife, based on your observations?

10 A.  Yes, ma'am.

11 Q.  And was the defendant interviewed the same day as the

12 search warrant execution?

13 A.  Yes, ma'am.

14 Q.  Was he generally cooperative at that time, do you know?

15 A.  Yes.

16 Q.  Did you conduct the interview?

17 A.  I did not.

18 Q.  Did you listen to a recording?

19 A.  I did.

20 Q.  Did he inquire, during or toward the end of the interview,

21 about how he can get the guns back that day?

22 A.  Yes.  He inquired if he would purchase a safe, if he'd be

23 able to expedite the return of the weapons.

24 Q.  Was he arrested at the time of the search warrant?

25 A.  No, ma'am.

1   Q.  Why not?

2   A.  Again, we continued the investigation.  Went back, reported

3   the findings.  As you had mentioned before, now that we were

4   aware of multiple weapons, there -- a trace and information we

5   run on those weapons as well.  And we wanted to provide the

6   information to the U.S. Attorney's Office that was found in the

7   search warrant in looking at an arrest warrant moving forward.

8   Q.  Were all of the firearms, whether they are prohibited or

9   not, and the ammunition, seized and taken into evidence?

10  A.  Yes, ma'am.

11  Q.  So there was nothing left behind at the residence at that

12  time.

13  A.  Not to the best of my knowledge.  No.  Correct.

14  Q.  And then was the defendant indicted on October 23rd for

15  threats through interstate commerce?

16  A.  Yes, ma'am, I believe so.  Yes.

17  Q.  And was there an arrest warrant served on October 25th?

18  A.  Yes.

19  Q.  Also, 2019?

20  A.  Yes.

21  Q.  Were you there for the serving of the arrest warrant?

22  A.  I was.

23  Q.  What time did that occur?

24  A.  About 7:00 in the morning.

25  Q.  Did the defendant make any comments during the arrest?

1    A.  He did.  He was a bit upset in the process of arrest, and

2    he had stated, excuse my language, but, "Fuck Adam Schiff."  He

3    had referred to us as "fucking liberals."  And he was

4    particularly upset with the female sergeant that was with us

5    for the first interview in the search warrant, as well as the

6    arrest warrant, in how she was handling him in escorting him to

7    the vehicle.  And at that point I took over that escort and

8    walked him to the vehicle the rest of the way.

9    Q.  Did he say or do something that caused you to take over the

10   escort to the vehicle?

11   A.  He was feeling that she was escorting him improperly, and

12   cranking on his wrist, and he was yelling at her to stop that.

13   And so that wouldn't escalate anywhere, I took over the escort

14   and we didn't have any issues the rest of the way to the

15   vehicle.

16   Q.  Did you observe the issues that he was complaining about?

17   Were you watching and seeing whether or not he was being

18   handled improperly?

19   A.  I didn't observe anything improper, no, ma'am.

20   Q.  And did he make any comments about the search warrant?

21   A.  He did say, "Keep that bitch away from me."

22   Q.  Did you transport the defendant to --

23   A.  I did.

24   Q.  -- after he was arrested?  Okay.

25       And what did you note during the transport?

1    A.   During the transport there were no conversations.  But the

2    inside of the cabin of the vehicle, for lack of a better way to

3    explain it, smelled of booze breath.

4    Q.   And did he fall asleep during transport?

5    A.   He appeared to do so.  At least closed his eyes.  And like

6    I said, there was no conversation.

7    Q.   And then, on December 4th, 2019, was the defendant indicted

8    with a superseding indictment to add the prohibited possessor

9    as a convicted felon charged for the firearms and ammunition

10   that you detailed?

11   A.   Yes, ma'am.

12   Q.   Did you note, was there any alcohol on the property?

13   A.   There appeared to be a case of vodka in one of the storage

14   areas.

15   Q.   Also during the interview that you listened to, did the

16   defendant acknowledge that he had a sex offense out of

17   Maryland?

18   A.   Yes, ma'am.

19   Q.   Was there also discussion about his Arizona convictions

20   having been expunged?

21   A.   Yes.

22        MS. SAVEL:  I don't have any other questions.

23        THE COURT:  Thank you.

24             CROSS-EXAMINATION

25   BY MR. ROACH:

1   Q.  I'm sorry, is it "Officer" or "Agent" Desrosiers?

2   A.  Agent Desrosiers.

3   Q.  I'm sorry.  Agent Desrosiers, when I am asking you

4   questions, my understanding is that it was actually the -- this

5   case was assigned to a Sergeant -- is it Tereba?

6   A.  Correct.

7   Q.  I'm going to ask you some questions.  When I say, "you,"

8   you can generally assume that I am talking about either you or

9   Sergeant Tereba who had done these things.  Okay?  And if

10  you --

11  A.  Understood.  Yes, sir.

12  Q.  Okay.  Thank you.

13      So your understanding is there was a phone call made

14  October 1st, 2019.

15  A.  Yes.

16  Q.  You got the case or became aware of that on October 2nd,

17  2019.

18  A.  Yes.

19  Q.  On October 3rd, you and the sergeant came to Tucson.

20  A.  Correct.

21  Q.  Are you familiar with Tucson and the surrounding environs

22  before this case?

23  A.  Not very well, no, sir.

24  Q.  And on October 3rd, you had contact with Mr. Meister.

25  A.  I did.

1  Q.  Before the time that you came to Tucson to talk to

2  Mr. Meister, did you run a background check on Mr. Meister?

3  A.  I personally did not.  The agency did, yes.

4  Q.  And were you aware that he had had felony convictions?

5  A.  Yes.

6  Q.  And were you aware at that point that he had had the

7  conviction that you discussed with the prosecutor out of

8  Maryland, in 1988?

9  A.  We were aware of the arrest which came back in the MCIC

10  return, but I don't know that we had the full details of that

11  situation at that time.

12  Q.  So, on October 3rd, Mr. Meister voluntarily comes down to

13  talk to you guys.

14  A.  Yes.

15  Q.  And he indicated that he did not remember making the phone

16  call to Adam Schiff.

17  A.  That's correct.

18  Q.  You played it for him, and he confirmed that that was his

19  voice?

20  A.  Yes, sir.

21  Q.  Did he make any apologies for the phone call?

22  A.  He said he was drunk and that that was out of character for

23  him.

24  Q.  Out of character?

25  A.  Yes, sir.

1  Q.  And he said he had been watching Fox News and that'd been

2  apparently what had upset him?

3  A.  Yes.  That's what he talked had caused that, correct.

4  Q.  Now, did you ask him if he had any plans to travel to D.C.

5  or to travel to see Mr. Schiff?

6  A.  Yes, sir.

7  Q.  And what did he say?

8  A.  No.

9  Q.  On October 3rd or on October 18th, either one of those

10 times, did you ever find any evidence indicating that he hadn't

11 been intending to travel to D.C.?

12 A.  No, sir.

13 Q.  Was that interview on October 3rd audio recorded?

14 A.  No, sir.

15 Q.  And I think you'd said he voluntarily showed you his phone

16 that had the phone call in question on a call log.

17 A.  Yes, sir.

18 Q.  Describe his demeanor as you were talking to him on that

19 day.  The 3rd, that is.

20 A.  He was fine.  We had a fine conversation.

21 Q.  Would you say "cooperative"?

22 A.  Oh, yes.  Yes.

23 Q.  Then I'm going to pop forward now to October 18th.

24     At this point, you were aware or you suspected that there

25 was at least black powder weapons on the property that

1  Mr. Meister was staying.

2  A.  Yes.  At least a muzzle loader that he had talked about

3  having.

4  Q.  And that's one of the reasons why you obtained the search

5  warrant, to see if there were any prohibited weapons.

6  A.  That's correct, sir.

7  Q.  And I think you indicated previously that the black powder

8  revolvers and the muzzle loader were not considered to be

9  federal firearms.

10 A.  Yes.  I am not an expert there, sir, but based on the

11 knowledge that we had, that's definitely -- there are some

12 situations, if they can be readily modified in a certain way,

13 that can cause some issues.  But to the best of our knowledge,

14 yes, correct, that they would not have been in the federally

15 firearms in the traditional sense.

16 Q.  And October 18th, there was an interview with -- that also

17 included an ATF agent.

18 A.  That's correct.

19 Q.  And you've had a chance to review the audiotape of that

20 interview.

21 A.  I have listened to it, yes.

22 Q.  Did Mr. Meister -- was he confronted about the modern

23 firearms that were found at the property?

24 A.  Yes.  We discussed that.

25 Q.  And he indicated a number of times that those were his

1  wife's property.

2  A.  That is correct.

3  Q.  And then you were able or some law enforcement agency --

4  agent was able to go back and do some research and find that

5  Ms. Dionne Meister was, in fact, the purchaser of at least two

6  of the modern firearms.

7  A.  That's what it appears to be, yes, sir.

8  Q.  Okay.  During your service of the search warrant, how long

9  do you say you were at the property?

10 A.  I don't recall the exact length, but definitely a few

11 hours.

12 Q.  Were Mr. Meister and Mrs. Meister cordial to you during the

13 search?

14 A.  Yes.

15 Q.  Did they provide beverages for you?

16 A.  I don't recall ever getting beverages from them personally,

17 sir, but I can't deny that they didn't take -- give some to

18 someone else.

19 Q.  Okay.  Did they voluntarily allow you to search areas that

20 were not covered by the search warrant?

21 A.  They did.

22 Q.  And you searched them, or you or another law enforcement

23 agent searched the areas that were not covered by the search

24 warrant.

25 A.  Yes, sir.

1    Q.  So at that point you were aware that he'd had a -- at that

2    point that he had a prior conviction out of Maryland, that had

3    not been expunged; correct?

4    A.  Yes, sir.

5    Q.  And you were aware of the existence and placement of the

6    modern firearms that you described to the prosecutor.

7    A.  Yes.

8    Q.  And at that point, though, you chose not to arrest

9    Mr. Meister.

10   A.  That's correct.

11   Q.  So eventually on, I'm sorry, October 25th, Mr. Meister, you

12   did get a search warrant and come to arrest him on that date.

13   A.  An arrest warrant, yes, sir.

14   Q.  Yes.  And was that about 7:00 a.m.?

15   A.  It is.  It was.  Yes.

16   Q.  Did you call him and ask him to come out, or did you go to

17   the door itself?

18   A.  No, we pulled into the driveway and called him out using

19   the loud speaker on the vehicle.

20   Q.  All right.  And did he come out voluntarly?

21   A.  He came out of the RV, yes.

22   Q.  Did he resist in his arrest?

23   A.  No.

24   Q.  So you said at some point Mr. Meister exclaimed that Ms.,

25   I'm sorry, Sergeant Tereba was twisting his wrist; correct?

1    A.  Yes.

2    Q.  And would you describe that as calling out in pain when he

3    said something about his wrist?

4    A.  It appeared to be more of anger.

5    Q.  And were you watching what was happening to his wrist at

6    that time?

7    A.  I became alerted to it.  He was walking back toward the

8    vehicle that I was going to be driving, so I could not see

9    behind him at the time, but when he started to yell about the

10   wrist towards the sergeant, I walked up and I said I'd help

11   finish the escort back to the vehicle.

12   Q.  Did he ever accuse you of twisting his wrist or causing him

13   any personal harm?

14   A.  No, sir.

15   Q.  You said he made some comments about liberals and Adam

16   Schiff, was that before or after the time when he alleged that

17   Sergeant Tereba had been twisting his wrist?

18   A.  It was as I was escorting him to the vehicle, so just after

19   that situation.

20   Q.  Okay.  So, as far as what he's reporting, a law enforcement

21   officer just hurt him, and then he is exclaiming to you after

22   that about dislike of the officer and Adam Schiff.

23   A.  He didn't complain to me about being hurt, sir.  He was

24   upset with how he felt he was being handled.

25   Q.  And he thought his wrist was being twisted; correct?

1    A.  That's what he claimed, yes.

2              MR. ROACH:  Thank you.  No further questions.

3              THE COURT:  Thank you.

4                      REDIRECT EXAMINATION

5    BY MS. SAVEL:

6    Q.  With regard to the congressman, Congressman Adam Schiff,

7    what is his district or area of responsibility?

8    A.  He represents a district in California.  I believe the 28th

9    District of California, if I remember correctly.

10   Q.  And there's been talk about the areas that were searched,

11   that the defendant gave permission for the agents to search;

12   what areas were those?

13   A.  I believe he was referring to the vehicles, and there was a

14   boat on the property as well.

15   Q.  And then when you all met with the defendant on October 3rd

16   at his property, was there any indication that he'd been

17   drinking at that time?

18   A.  You said the -- you're saying on the 3rd, the initial

19   interview?

20   Q.  Correct.

21   A.  No, ma'am.  Not that I can discern at that time of day in

22   the dark.  We were in open air, I didn't smell anything of that

23   nature.

24   Q.  Ultimately, did you all have any concerns about the

25   defendant's travel elsewhere besides D.C.?

1  A.  Well, the congressman does return periodically home to

2  California, and that's obviously a much shorter distance than

3  Washington, D.C.; so there would be concerns there that he

4  could travel one state away, as opposed to having to come all

5  the way across the country.  Yes.

6          MS. SAVEL:  I don't have any other questions.

7          THE COURT:  Thank you.  May the witness be excused?

8          MS. SAVEL:  Yes.

9          THE COURT:  Thank you.  May the witness be excused?

10         MR. ROACH:  Yes, Your Honor.

11         THE COURT:  Mr. Desrosiers?

12         THE WITNESS:  Yes, ma'am.

13         THE COURT:  You are excused, sir.  Thank you.

14         THE WITNESS:  Thank you, all.

15         THE COURT:  Thank you.

16     Ms. Savel, was there any other argument that you wanted to

17  make?

18         MS. SAVEL:  If I could just wrap it up.

19     While the defendant wasn't immediately arrested, the grave

20  concern here is that there was a ramping up of behavior.

21  Agents met with the defendant to try to assess the threat, they

22  left, and then when they executed a search warrant, they found

23  numerous weapons, federally prohibited firearms, that the

24  defendant did not report to them that were readily accessible

25  and strategically placed throughout the bedroom and the

1  entryway of the residence.

2      In addition, even after contact with the agents, where they

3  execute a search warrant, when they showed up to arrest him at

4  7:00 o'clock in the morning, on October 25th, he had the odor

5  of alcohol, and, despite knowing they are federal agents,

6  yelled expletives and was, you know, cussing at the agents and

7  made comments about the congressman once again, despite the

8  circumstances, despite the fact that they're agents.

9      It seems that his behavior is alcohol-fuelled.  He didn't

10 acknowledge any kind of substance abuse issue in the Pretrial

11 Services report, nor did he think he needs treatment.  And I am

12 not advocating for treatment today, but the concern is that

13 living with his wife, who seems to be his one tie, his one

14 connection here in Arizona, with a residence that can travel,

15 and anger that is fuelled by alcohol, and what the Government

16 would submit is a severe substance abuse problem, as well as a

17 desire to get the guns back the same day that they were seized

18 by agents, if he just went out and got a safe, we're very

19 concerned about the safety not only for the congressman, but

20 danger to the community.  Because it's not just a test of

21 whether or not the victim is in danger, but whether or not the

22 community is in danger.

23     So for those reasons we would request that he remain

24 detained.

25         THE COURT:  Mr. Roach, anything else you wanted to

1  add?

2          MR. ROACH:  Yes, Judge.

3      I mean, I could not disagree stronger, that, one, I don't

4  see any escalation of his behavior.  He intentionally applied

5  to get his gun rights back in the State of Arizona, but was

6  still very cognizant of the fact that he should not have the

7  weapons; so he does not, his wife does.

8      And if he was doing something illegal -- again, the agents

9  come to him on October 3rd -- then he would hide the guns and

10  get rid of them.  Because they weren't his guns, and he didn't

11  think -- he didn't get rid of them because they weren't his

12  guns.  He did have muzzle loaders, which were not federal

13  firearms, so it's not illegal -- was not illegally possessing

14  those firearms, Judge.

15      And so, on October 25th, again, a week after all this

16  information is known to the government, and, again, you have

17  been around a long time, you have seen many, many cases, I

18  would say probably most cases where, after a search warrant,

19  the officers arrest the subject if they're there.  I mean, I

20  would say that is the most common.  Rather than, search

21  warrant, finding what they consider to be contraband, and

22  leaving.  Because they did not consider him to be a realistic

23  danger to Mr. Schiff.

24      And then I don't know how, in the State of Arizona, you can

25  say somebody possessing -- or somebody's wife's possessing a

firearm makes them a danger to the public, in general, I don't
know where that would come from, because there is no indication
that he was threatening anybody else and that he'd ever done
anything like that in his history.  So any indication of his
dangerousness is belied by the agents' actions themselves.
They didn't really believe he was dangerous.

Now, I'm not, again, arguing whether or not a crime was
committed, because that's really a different question.  But
what I'm saying is:  Was he a realistic threat, and is he
realistic threat?  The answer to that is no.

He was cooperative with law enforcement the entire time,
until one of the officers, I suggest, intentionally kind of
gave him a little twist because she did not like what he had
done, and that was the one time that he reacted.  And then,
when a different officer took over, again, no more problems.
So, yes, there was a slight issue right there, but I would
suggest, from the circumstantial evidence, that there might
have been some contributory negligence by the officer to bring
that out of him.

So, Judge, he is not a flight risk.

The prosecution says his only ties to Arizona are his wife.
I can't see where that comes from either, because he's been
here for years and years and years, worked here for years and
years and years, owns property here for years, and doesn't have
any ties anywhere else, in any other countries, and he talks

about his sister or siblings either not being alive anymore or
doesn't really talk to him. All of his ties are in the State
of Arizona. All of his ties are here, including his offer of a
job here. He was fixing up the property that they had
purchased fairly recently, after owning a house in Chandler for
years.

If he was a flight risk, he would have fled. If he was a
danger, they would have arrested him. I would suggest neither,
Your Honor.

If there is any concern about the alcohol -- and I would
agree with the prosecution's assessment that if there was no
alcohol, I think this phone call would have never been made.
So if the Court has any concern that maybe he does stupid
things when he is drinking, he will do whatever, and anything
the Court would ask of him, to prove that he will not be
consuming alcohol.

I know in state courts, but I've not seen it in federal
court, they've had people released to Pretrial Services with an
ankle monitor that actually tests alcohol. I don't know
exactly how the science works, but I know that those kind of
things are available, so he could be monitored 24 hours, to
make sure he doesn't drink alcohol.

I've explained to him since the time of this Pretrial
Services arrest, "Hey, anybody looking at you would think maybe
you do have a problem with alcohol," and he has agreed that he

1  would be willing to do outpatient treatment and do any kind of

2  alcohol monitoring that the Court would consider.  And he

3  understands this.  And he understands that alcohol is what got

4  him here today, because of that stupid phone call.

5          So, for that reason, Judge, I believe that there are many

6  different, less serious conditions that this Court could place

7  on him to make sure that he is not a danger to anybody in the

8  community, including Mr. Schiff, and that he is not going to

9  flee, and I think anything that the Court wanted to do

10 involving alcohol monitoring, he'd be willing to do, and that's

11 what we would ask.

12              THE COURT:  Thank you.

13         So I have reviewed the magistrate judge's order, I've

14 reviewed the Pretrial Services report; they continue to

15 recommend detention based on dangerousness to the community and

16 a flight risk.

17         I am not quite sure as to the flight risk issue, but I do

18 think that based on the nature of this indictment, based on the

19 firearms that were present in his household, the alcohol

20 consumption being present, or being a reason given for the

21 phone call to begin with, and then the use at the time of the

22 arrest, his criminal history is very troubling, it involves

23 prior convictions, although I believe one may have been

24 expunged, of a violent nature nonetheless, and perhaps this was

25 not a realistic threat, that's neither here nor there at this

1  time, the reality is that it was a threat nonetheless.  So, you

2  know, at this time I am not inclined to release him.

3      So I am going to affirm the magistrate judge's order of

4  detention.

5      Perhaps at a later date if there is inpatient treatment

6  that is available, and we have more information as to the

7  situation of this case, then I would be willing to entertain a

8  motion to reconsider under other conditions of release; but at

9  this time I don't see any that would assure the public safety,

10  and neither does Pretrial Services.

11      So the appeal is denied.

12      Anything further from the government?

13          MS. SAVEL:  Your Honor, I know we've already run over.

14  The arraignment is scheduled for December 20th.  Did we want to

15  keep that date?

16          THE COURT:  Yes, we'll keep that date of December

17  20th.

18          MS. SAVEL:  Thank you.

19          THE COURT:  Thank you.

20      Anything further, Mr. Roach?

21          MR. ROACH:  No, thank you.

22          THE COURT:  Thank you.  You are excused.

23              (Off the record at 2:41 p.m..)

24

25

1          C E R T I F I C A T E

2

3          I, A. TRACY JAMIESON, do hereby certify that I am

4     duly appointed and qualified to act as an Official Court

5     Reporter for the United States District Court for the District

6     of Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8     a full, true and accurate transcript of the proceedings

9     contained herein, held in the above-entitled cause on the date

10    specified therein, and that said transcript was prepared by me.

11          Signed in Tucson, Arizona, on the 11th of

12    February, 2020.

13

14

15                                        s/A. Tracy Jamieson
16                                        A. Tracy Jamieson, RDR, CRR

17

18

19

20

21

22

23

24

25